21 F.3d 1491
 Michael C. COLLINS, Leslie Collins, Mark Vovos as guardian
ad litem for Barbara Collins, Plaintiffs-Appellants,
v.
SCHWEITZER, INC., World Wide Ski Corp., dba NASTAR, Riblet
Tramway Company, Defendants-Appellees.
 No. 91-36183.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 11, 1993.
Decided April 26, 1994.
 
 Hollis H. Barnett, Campbell, Dille & Barnett, Puyallup, Washington, for plaintiffs-appellants.
 Peter C. Erbland, Paine, Hamblen, Coffin, Brooke & Miller, Coer D'Alene, ID, for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before: BRUNETTI, LEAVY, and TROTT, Circuit Judges.
 Opinion by Judge BRUNETTI; Dissent by Judge LEAVY
 BRUNETTI, Circuit Judge:
 
 
 1
 Appellants Michael Collins and his two daughters appeal the district court's grant of appellees' motion for summary judgment. Collins, who became a quadriplegic after falling and breaking his neck on a ski lift tower, brought a diversity action for personal injury based on the alleged negligent operation of the race course by appellees Schweitzer, Inc. and World Wide Ski Corp. We affirm.
 
 I. Facts and Proceedings Below
 
 2
 Appellee Schweitzer, Inc. ("Schweitzer") is an Idaho corporation which operates the Schweitzer Mountain Resort ski area in northern Idaho. Appellee World Wide Ski Corp. ("NASTAR") is a Colorado corporation which promotes amateur ski racing around the country by providing ski areas with a package program for staging races and by keeping a central database of skier times.
 
 
 3
 At the time of his accident, Collins was an Idaho resident (though he is now a Washington resident) and an expert skier. He had a season ski pass to the Schweitzer Mountain Resort. He was an experienced amateur racer, having competed in dozens of NASTAR races and been a top-ranked skier in the Northwest in his age group.
 
 
 4
 On January 31, 1988, Collins skied his last race. Schweitzer had set up a "dual format" slalom racecourse, in which two skiers race side by side. The finish line was approximately 123 feet above and 48 feet to the right (looking down the slope) of a chairlift tower. Schweitzer had placed nylon net fencing in an "S" configuration in front of the tower, and padding two to four inches thick around the base of the tower. Collins skied the course, finished close behind the other racer, and tried to turn right to avoid him. He fell, slid through the netting, and broke his neck on the tower. He is now a quadriplegic.
 
 
 5
 Collins brought an action for personal injury and other damages against Schweitzer and NASTAR in the U.S. District Court for the Eastern District of Washington. Collins alleged that Schweitzer was negligent in setting the race course and that NASTAR was vicariously liable for Schweitzer's negligence, and also negligent in its own right for not properly instructing Schweitzer on the setting of race courses and for not inspecting the course to ensure that it was safe. After defendants contested jurisdiction, the court transferred venue to the U.S. District Court for the District of Idaho. Defendants moved for summary judgment, and the district court granted the motion. Collins appeals the grant.
 
 II. Standard of Review
 
 6
 We review the district court's grant of summary judgment de novo. T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 629 (9th Cir.1987). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 III. Schweitzer
 
 7
 A. Applicability of the Idaho skier statute.
 
 
 8
 In 1979, the Idaho legislature enacted a law entitled "Responsibilities and Liabilities of Skiers and Ski Area Operators," Idaho Code Secs. 6-1101 through 6-1109 (the "Act"). The purpose of the Act is to "define those areas of responsibility and affirmative acts for which ski area operators shall be liable for loss, damage or injury, and to define those risks which the skier expressly assumes and for which there can be no recovery." Idaho Code Sec. 6-1101 (1990). The Idaho Supreme Court has noted that "in enacting the Act the legislature intended to limit rather than expand the liability of ski area operators." Northcutt v. Sun Valley Co., 117 Idaho 351, 354, 787 P.2d 1159, 1162 (1990).
 
 
 9
 Under the definitions supplied by the Act, Collins was a "skier" and Schweitzer a "ski area operator."[1] The Act states that "[e]ach skier expressly assumes the risk of and legal responsibility for any injury to person or property which results from participation in the sport of skiing including any injury caused by ... lift towers and components thereof." Idaho Code Sec. 6-1106 (1990).[2] According to the plain language of the Act, Collins as a skier expressly assumed the risk of an injury resulting from striking a lift tower, and therefore cannot recover from Schweitzer for his injury.[3]
 
 
 10
 Collins attempts to circumvent this strict risk allocation scheme by contending that the relevant statutory provision is not section 6-1106, but rather section 6-1103, which requires ski area operators to assume a duty "[n]ot to intentionally or negligently cause injury to any person." Idaho Code Sec. 1103(10) (1990).[4] The section provides that except for nine enumerated duties, a ski area operator "shall have no duty to eliminate, alter, control or lessen the risks inherent in the sport of skiing, which risks include but are not limited to those described in section 6-1106." Id. Collins contends that the risks of NASTAR racing are not "inherent in the sport of skiing" and that therefore Schweitzer had a duty to reduce those risks. However, the statute plainly states that "inherent" risks include those listed in section 6-1106, one of which is the risk of injuries caused by lift towers. Section 6-1106 does not distinguish between injuries suffered during racing and injuries suffered during other types of skiing, and there is no legislative history to indicate that the Idaho legislature intended such a distinction.[5]
 
 
 11
 Under the Act, then, Schweitzer owed Collins no duty to reduce the risk of his striking and injuring himself on the lift tower. Without a duty there can be no tort and Collins may not recover from Schweitzer. We affirm the district court's grant of summary judgment for Schweitzer.
 
 
 12
 B. Constitutionality of the Idaho skier statute.
 
 
 13
 Collins contends that the Act is unconstitutional because it grants blanket immunity to ski area operators but not to other tortfeasors, and consequently "unfairly discriminates against skiers and denies Michael Collins the equal protection of the laws as guaranteed by the Fourteenth Amendment." Brief of Appellants at 27. We review "[h]ealth, safety and economic classifications not based on race or gender ... at the minimum level of equal protection analysis." United States v. Garren, 893 F.2d 208, 210 (9th Cir.1989) (applying the rational relationship test to a statute discriminating between commercial and non-commercial river rafters). The Act establishes such a classification, and therefore we review it under the rational relationship test.[6]
 
 
 14
 Under this test, the Act violates Collins' right to equal protection only if it "d[oes] not bear any rational relationship to a legitimate government interest." Id. at 210. The government of Idaho clearly has a legitimate interest in promoting the sport of skiing, because the sport "significantly contribut[es] to the economy of Idaho." Idaho Code Sec. 6-1101 (1990). The Act bears a rational relationship to this interest because it clarifies the allocation of risks and responsibilities between ski area operators and skiers.[7] Thus, the Act passes the rational relationship test.
 
 IV. NASTAR
 
 15
 A. Principal/agent relationship with Schweitzer.
 
 
 16
 Collins' complaint alleged that Schweitzer was NASTAR's agent for the purpose of implementing the NASTAR races, and that as the principal, NASTAR was responsible for the negligent acts of Schweitzer. We agree with the district court that the question of whether Collins is NASTAR's agent is moot.
 
 
 17
 The general rule in Idaho is that "[a] principal is liable for the torts of an agent committed within the scope of the agency relationship." Sharp v. W.H. Moore, Inc., 118 Idaho 297, 303, 796 P.2d 506, 512 (1990). However, we held above that under the Act Schweitzer did not commit a tort because Collins assumed the risk of colliding with a lift tower and Schweitzer had no duty to protect him from such collisions. Because Schweitzer never committed a tort, there is nothing to hold NASTAR liable for even if Schweitzer is NASTAR's agent.[8]
 
 
 18
 B. General duty of due care.
 
 
 19
 Collins' complaint alternatively alleged that NASTAR owed a duty to the skiing public to use ordinary care in instructing ski areas on how to set up safe racecourses, and also to inspect those courses to ensure their safety.
 
 
 20
 The evidence in the record indicates that Schweitzer assumed full responsibility for racecourse design and layout, and that NASTAR never assumed a duty to inspect. Paul Norum, the Schweitzer official responsible for supervising and directing the NASTAR program, stated in his affidavit that
 
 
 21
 4. Schweitzer has always been solely responsible for the placement, location, maintenance, operation and construction of the NASTAR amateur race course. NASTAR is not expected by Schweitzer to provide training supervision or inspection for the amateur ski racing program. NASTAR does not send representatives to supervise the preparation of, or conduct of, any ski race.
 
 
 22
 5. Schweitzer had exclusive control of the slopes and trails at Schweitzer, including the NASTAR amateur race course as part of the skiing offered to the public on January 31, 1988.
 
 
 23
 Merle Frazier, NASTAR's vice president, stated in his affidavit that
 
 
 24
 4. NASTAR does not construct, supervise, direct or control NASTAR ski racing courses at any ski area, including Schweitzer. NASTAR provides written guidelines for placement of race courses but the location and placement of the course is the responsibility of the ski area. NASTAR does not send representatives to supervise the preparation, or conduct of, any ski race.
 
 
 25
 The NASTAR manual, cited by Collins as evidence to the contrary, gives only general suggestions for the layout of racecourses, and nowhere states that NASTAR assumes any responsibility to inspect them. Finally, Collins does not allege that NASTAR should be required by law to assume a duty to instruct or inspect. Therefore, we affirm the district court's grant of summary judgment for NASTAR.
 
 
 26
 AFFIRMED.
 
 LEAVY, Circuit Judge, dissenting:
 
 27
 Schweitzer contracted with World Wide Ski Corporation to allow Schweitzer to hold NASTAR[1] amateur ski races at its ski resort near Sandpoint, Idaho. Schweitzer employees ran the NASTAR program and set up the course for the race. For several years prior to the accident in question, Schweitzer set the dual format race course[2] with the finish lines in an open area to the right of the lift tower. However, for the race in which the accident happened, Schweitzer placed the finish line to the left and above the lift tower.[3] 3] The tower was approximately 125 feet below the finish line. When two skiers were finishing the dual race, the skier on the left would turn to the left, while the skier on the right would turn to the right and be directly uphill from the tower at some point in the turn.
 
 
 28
 Although the NASTAR regulations specifically warn against the danger of a steep finish,[4] Schweitzer had placed the new finish line in an area where the slope was steeper, rather than flatter, making the right lane even more dangerous with its position above the tower.
 
 
 29
 Padding on the tower was two to four inches thick and four feet high. This padding was installed on the tower before the race to protect skiers, not necessarily ski racers.
 
 
 30
 Schweitzer placed net fencing in an "S" pattern immediately above the lift tower. Only ski poles secured the fencing. As described by John Pucci, the Ski Patrol Director at Schweitzer, who has worked on ski patrol for twenty-two years, the efficacy of the netting in stopping a fast-moving skier is questionable:
 
 
 31
 Q. Have you seen some skiers slide into [the type of netting used in front of the tower] and slow down?
 
 
 32
 A. Yes. Well, actually, you know, they're just ski poles stuck in the snow, and if you're going at any high rate of speed, it's not going to slow you down a lot, but it will break the speed somewhat. Eventually, you're going to stop because you're going to have to pull out all these poles. You know what I mean?
 
 
 33
 If you hit the middle of that fence, say if that fence were stretched all the way out and you hit it, those poles where you impacted are going to pull out of the snow and you're going to pull each one out as you--depending on how fast you were in the slide when you hit that fence. You may pull all the poles out before you stop or you may not, depending on the speed.
 
 
 34
 ER tab 59 at 9-10.
 
 
 35
 On the day of the race, the snow was hard-packed, which meant that a fallen skier would slide on the surface rather than sink into the snow and stop.
 
 
 36
 Collins himself summarized the adverse conditions that contributed to his accident:
 
 
 37
 The area below the finish line was steeper than the finish area itself and was not a long level runout. There was not room for two skiers finishing the race in close proximity to safely ski to the left of the lift tower. Most of the skiers that skied the race would not stop until they had skied below the lift tower that I struck. Snow conditions were such that I continued sliding at a rapid rate of speed on the snow after falling. I hit the web fencing that had been placed above the lift tower; however, the fencing did little to slow my speed, and the fencing wrapped around my body and pulled the ski poles that held the fencing in place out of the snow. I then struck the lift tower with the back of my neck, fracturing my cervical vertebrae and rendering me immediately a quadriplegic.
 
 
 38
 Id., tab 66 at 5-6.
 
 
 39
 The majority holds that because Collins was a skier, as defined in Idaho Code Sec. 6-1102(6) (1990), and because he expressly assumed the risks that result from participating in the sport of skiing, defined to include injury caused by a lift tower, he cannot recover.
 
 I.
 Idaho legislative policy is clear:
 
 40
 1) It recognizes that skiing is a hazardous activity even when conducted in the absence of negligence. It defines those risks which the skier expressly assumes as:
 
 
 41
 [I]njury to person or property which results from participation in the sport of skiing including any injury caused by the following, all whether above or below snow surface: variations in terrain; surface or subsurface snow or ice conditions; bare spots, rocks, trees, other forms of forest growth or debris, lift towers and components thereof; utility poles, and snowmaking and snowgrooming equipment which is plainly visible or plainly marked in accordance with the provision of section 6-1103, Idaho Code.
 
 
 42
 Idaho Code Sec. 6-1106.
 
 
 43
 2) It imposes a duty on the operator "[n]ot to intentionally or negligently cause injury to any person; provided, that except for" certain statutory duties "the operator shall have no duty to eliminate, alter, control or lessen the risks inherent in the sport of skiing, which risks include but are not limited to those described in section 6-1106, Idaho Code." Idaho Code Sec. 6-1103.
 
 
 44
 3) It absolves an operator from liability provided "that no activities undertaken by the operator in an attempt to eliminate, alter, control or lessen such risks shall be deemed to impose on the operator any duty to accomplish such activities to any standard of care." Id.
 
 
 45
 The Idaho statute expressly requires the skier to assume "the risks inherent in the sport of skiing" but it says nothing about assuming the risk of the operator's negligence in laying out a dangerous race course. The statutory assumption of risk is not a defense to the operator's negligence; rather, by force of the statute a skier assumes risks inherent in the sport of skiing "which are essentially impossible to eliminate by the ski area operation[.]" Idaho Code Sec. 6-1101. Certainly, it was not "essentially impossible to eliminate" the risk of dangerously positioning the finish line of a race course. Therefore, an operator is not absolved from liability for laying out a course that creates an unreasonable hazard. Here, the operator clearly generated the risk by the placement of a finish line that aimed one of the two racers directly at the tower.
 
 II.
 
 46
 The Idaho Code provides that there is no standard of care, and thus no negligence, if the operator undertakes to diminish any risk inherent in the sport of skiing:
 
 
 47
 [T]he operator shall have no duty to eliminate, alter, control or lessen the risks inherent in the sport of skiing, which risks include but are not limited to those described in section 6-1106, Idaho Code; and, that no activities undertaken by the operator in an attempt to eliminate, alter, control or lessen such risks shall be deemed to impose on the operator any duty to accomplish such activities to any standard of care.
 
 
 48
 Idaho Code Sec. 6-1103(10). However, Idaho Code Sec. 6-1103(10) specifically imposes a duty on the operator "not to intentionally or negligently cause injury to any person[.]" See Northcutt v. Sun Valley Co., 117 Idaho 351, 354-55, 787 P.2d 1159, 1162-63 (1990) ("Without a duty, there can be no negligence.").
 
 
 49
 In Northcutt, the operator attempted to diminish a risk inherent in skiing by posting a warning sign at the confluence of several runs, as required by the statute.[5] Northcutt hit the sign after a collision with another skier. Because the operator was engaged in an activity to fulfill a duty described in section 6-1103, the Idaho Supreme Court held there was no negligence in constructing a sign made from rigid wooden materials rather than materials that would have given way when Northcutt hit it. 117 Idaho at 355, 787 P.2d at 1163.[6]
 
 
 50
 I do not argue with the proposition that under the Idaho Code, if a skier in the normal course of skiing hits a tower and there is no other issue of the operator's negligence, the operator is not liable. The skier assumes that inherent risk of skiing. I do not believe, however, that the Idaho legislature intended to protect from liability an operator who places the finish line of a race course near an inadequately padded tower, so that ski racers are on a direct course toward the tower on a steep slope with only the flimsiest of nets to protect them. Certainly, the operator had control over where to put the finish line and what kind of net to erect to protect the racers. If the operator acted negligently, the racer did not assume the new risk.
 
 
 51
 This position is not inconsistent with Northcutt. In Northcutt, the Idaho Supreme Court said that the duties enumerated in Idaho Code Sec. 6-1103(1)-(9) and Idaho Code Sec. 6-1104 contained all of the duties of an operator to eliminate, alter, control, or lessen the inherent risks of skiing. Those duties are:
 
 
 52
 (1) To mark all trail maintenance vehicles and to furnish such vehicles with flashing or rotating lights which shall be in operation whenever the vehicles are working or are in movement in the skiing area;
 
 
 53
 (2) To mark with a visible sign or other warning implement the location of any hydrant or similar equipment used in snowmaking operations and located on ski slopes and trails;
 
 
 54
 (3) To mark conspicuously the top or entrance to each slope or trail or area, with an appropriate symbol for its relative degree of difficulty; and those slopes, trails, or areas which are closed, shall be so marked at the top or entrance;
 
 
 55
 (4) To maintain one or more trail boards at prominent locations at each ski area displaying that area's network of ski trails and slopes with each trail and slope rated thereon as to it [its] relative degree of difficulty;
 
 
 56
 (5) To designate by trail board or otherwise which trails or slopes are open or closed;
 
 
 57
 (6) To place, or cause to be placed, whenever snowgrooming or snowmaking operations are being undertaken upon any trail or slope while such trail or slope is open to the public, a conspicuous notice to that effect at or near the top of such trail or slope;
 
 
 58
 (7) To post notice of the requirements of this chapter concerning the use of ski retention devices. This obligation shall be the sole requirement imposed upon the ski area operator regarding the requirement for or use of ski retention devices;
 
 
 59
 (8) To provide a ski patrol with qualifications meeting the standards of the national ski patrol system;
 
 
 60
 (9) To post a sign at the bottom of all aerial passenger tramways which advises the passengers to seek advice if not familiar with riding the aerial passenger tramway.
 
 
 61
 Idaho Code Sec. 6-1103(1)-(9).
 
 
 62
 Every ski area operator shall have the duty to construct, operate, maintain and repair any aerial passenger tramway in accordance with the American national standards safety requirements for aerial passenger tramways.
 
 
 63
 Idaho Code Sec. 6-1104.
 
 
 64
 According to the court, not only does the operator have no other duties to eliminate, alter, control, or lessen the inherent risks of skiing, but if a ski operator undertakes to discharge any of the duties described, it may not be held to be negligent since the operator has no duty to accomplish the activity to any standard of care. Northcutt, 117 Idaho at 355, 787 P.2d at 1163.
 
 
 65
 The court also held that an operator could be negligent and thus liable when engaged in an activity that does not relate to eliminating, altering, controlling, or lessening the inherent risks of skiing: "Construing all the provision of the Act together to give meaning to each portion, we interpret the duty of a ski area operator not to cause injury negligently to refer to that failure to follow ... any duty that does not relate to eliminating, altering, controlling or lessening the inherent risks of skiing." Id.
 
 
 66
 The negligence complained of here is not that the appellees violated any duty imposed by Idaho Code Sec. 6-1103(1)-(9) or Sec. 6-1104. If activities other than those enumerated in section 6-1103 and section 6-1104 are undertaken, the operator has a duty not to cause injury negligently, unless those activities are undertaken to eliminate, alter, control, or lessen the inherent risks of skiing. Schweitzer was not trying to fulfill a duty imposed by section 6-1103 or section 6-1104 nor do appellants claim that Schweitzer violated any of those statutory duties.[7]
 
 
 67
 Therefore, there is a material issue of fact as to whether Schweitzer, in setting up the race course, was otherwise attempting to eliminate, alter, control, or lessen the inherent risks of skiing. A jury could find that the setting up of the course, including the establishment of the location of the finish line and the deployment of a net, was not done to eliminate, alter, control, or lessen the inherent risks of skiing. If a jury found that the race course was not set up for that purpose, then according to the Idaho statutes and Northcutt, the ski area operator had a duty not to negligently cause injury to the appellant. I would reverse and remand for trial.
 
 
 
 [1]
 The Act defines "skier" as "any person present at a skiing area under the control of a ski area operator for the purpose of engaging in the sport of skiing by utilizing the ski slopes and trails." Idaho Code Sec. 6-1102(6) (1990). The Act defines "ski area operator" as "any person, partnership, corporation or other commercial entity and their agents, officers, employees or representatives, who has operational responsibility for any ski area." Idaho Code Sec. 6-1102(4) (1990)
 
 
 [2]
 Section 6-1106 provides in relevant part:
 Each skier expressly assumes the risk of and legal responsibility for any injury to person or property which results from participation in the sport of skiing including any injury caused by the following, all whether above or below snow surface: variations in terrain; surface or subsurface snow or ice conditions; bare spots, rocks, trees, other forms of forest growth or debris, lift towers and components thereof; utility poles, and snowmaking and snowgrooming equipment which is plainly visible or plainly marked in accordance with the provisions of section 6-1103, Idaho Code.
 Idaho Code Sec. 6-1106 (1990).
 
 
 [3]
 Courts in other jurisdictions considering similar statutes have reached the same conclusion. See Schmitz v. Cannonsburg Skiing Corp., 170 Mich.App. 692, 428 N.W.2d 742, 744 (1988), appeal denied, 432 Mich. 856 (1989) (plaintiff skier who struck tree growing on defendant's ski slope expressly assumed the risk of the accident under the Michigan skier statute, which provided that skiers assumed the risk of injuries caused by trees); Berniger v. Meadow Green-Wildcat Corp., 945 F.2d 4, 8 (1st Cir.1991) (plaintiff skier who struck some netting on the side of defendant's trail expressly assumed the risk of the accident under the New Hampshire skier statute, which provided that skiers assumed the risks caused by such objects as lift towers, pole lines, and snowmaking equipment)
 
 
 [4]
 Section 6-1103 of the Act imposes on ski area operators a catchall duty
 [n]ot to intentionally or negligently cause injury to any person; provided, that except for the duties of the operator set forth in subsections (1) through (9) of this section and in section 6-1104, Idaho Code, the operator shall have no duty to eliminate, alter, control, or lessen the risks inherent in the sport of skiing, which risks include but are not limited to those described in section 6-1106, Idaho Code; and, that no activities undertaken by the operator in an attempt to eliminate, alter, control or lessen such risks shall be deemed to impose on the operator any duty to accomplish such activities to any standard of care.
 Idaho Code Sec. 6-1103(10) (1990).
 
 
 [5]
 The only legislative statements on the record about the Act are a "Statement" that the "purpose of this proposed legislation is to provide definitions, duties and the liability of ski area operators, skiers, tramway operators and passengers" and an estimate that the legislation will have "[n]o fiscal impact." 1979 Idaho Sess.Laws Ch. 270, Statement of Purpose/Fiscal Impact for H.B. 45
 
 
 [6]
 Every other court that has reviewed an equal protection challenge to a skier statute has used rational basis scrutiny. See, e.g., Northcutt, 117 Idaho at 357, 787 P.2d at 1165 (applying rational basis test to Act); Schmitz, 428 N.W.2d at 743 (applying rational basis test to Michigan skier statute); Pizza v. Wolf Creek Ski Dev. Corp., 711 P.2d 671, 679 (Colo.1985) (en banc) (applying rational basis test to Colorado skier statute); Lewis v. Canaan Valley Resorts, Inc., 185 W.Va. 684, 408 S.E.2d 634, 643 (1991) (applying rational basis test to West Virginia skier statute)
 
 
 [7]
 Contrary to Collins' assertion, the statute does not grant "blanket immunity" to ski area operators. See Northcutt, 117 Idaho at 357, 787 P.2d at 1165 (identifying those actions for which ski area operators remain liable)
 
 
 [8]
 The non-Idaho cases cited by Collins to support the proposition that an agent's personal immunity from tort liability does not necessarily extend to a principal are inapposite; they deal with situations where the agent clearly committed a tort but was immunized from liability, whereas here Schweitzer never committed a tort because Collins assumed the risk of lift tower collisions
 
 
 [1]
 NASTAR is the acronym for "National Standard Race."
 
 
 [2]
 The dual format race involves two courses set side by side and set close to each other with two skiers skiing at the same time. The dual course allows the skier to compete with his own time as well as the other skier
 
 
 [3]
 Collins states:
 On the date of the accident, January 31, 1988, the lower portion of the dual NASTAR slalom race course had been moved from the location where it had historically been located for the past three ski seasons and earlier that ski season. The remaining portion of the ski race course had not been changed. I looked at the course on the way up the hill; however, I presumed the race course was in the same location as in the past and did not notice that the end of the race course was different. The small hut located at the finish line which was used by the Schweitzer employees to time the finish appeared to be located in the same area.... There were no signs advising that the run had been changed.
 Appellant's Excerpt of Record ("ER") tab 66, para. 8 at 3-4.
 
 
 [4]
 NASTAR regulations state:
 Make sure that the finish area has a long, level, well marked and fenced off "runout" to avoid collisions. Continually remind racers to move out of the finish area.
 ER tab 67, para. 8 at 16 (emphasis added).
 
 
 [5]
 Idaho Code Sec. 6-1103(3) requires that the operator "mark conspicuously the top or entrance to each slope or trail or area, with an appropriate symbol for its relative degree of difficulty."
 
 
 [6]
 Likewise, two other cases the majority cites, Schmitz v. Cannonsburg Skiing Corp., 170 Mich.App. 692, 428 N.W.2d 742, 744 (1988), appeal denied, 432 Mich. 865 (1989) (skier struck a tree on the ski slope) and Berniger v. Meadow Green-Wildcat Corp., 945 F.2d 4 (1st Cir.1991) (skier struck netting on the side of a trail used to mark hazards), are distinguishable because they involve inherent risks of skiing, not operator negligence
 
 
 [7]
 The appellees state: "Appellants do not claim that Schweitzer violated any of the duties listed in subsections (1) through (9)." Appellees' Brief at 10