CONTRACTOR'S SUPPLY OF WATERBURY, LLC *v.*
COMMISSIONER OF ENVIRONMENTAL
PROTECTION
(SC 17592)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued January 4—officially released July 10, 2007

*Brendon P. Levesque*, with whom were *Michael S. Taylor*, and, on the brief, *Mark S. Shipman*, for the appellant (plaintiff).

*Sharon A. Scully*, assistant attorney general, with whom were *Kimberly P. Massicotte*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Opinion*

BORDEN, J. The plaintiff in this declaratory judgment action, Contractor's Supply of Waterbury, LLC, appeals from the judgment of the trial court rendered in favor of the defendant, the commissioner of environmental protection. The plaintiff contends on appeal that: (1) General Statutes (Rev. to 1999) § 22a-196 violates its right to equal protection and due process under the federal and state constitutions because the statute does not bear a rational relation to a legitimate state interest; and (2) the trial court improperly concluded that the defendant had not applied § 22a-196 retroactively to the plaintiff in violation of General Statutes § 55-3.[1] We

[1] General Statutes (Rev. to 1999) § 22a-196 provides: "No asphalt batching or continuous mix facility shall be located in an area which is less than one-third of a mile in linear distance from any hospital, nursing home, school, area of critical environmental concern, watercourse, or area occupied by residential housing. Such distance shall be measured from the outermost perimeter of such facility to the outermost point of such zones provided that any such facility in operation as of December 31, 1997, shall not be subject to the provisions of this section."

General Statutes § 55-3 provides: "No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."

disagree, and, accordingly, we affirm the judgment of the trial court.

The plaintiff brought this action seeking a judgment declaring that application of § 22a-196 to the plaintiff violated its rights to equal protection and due process under both the federal and state constitutions and that the defendant improperly had applied the statute retroactively to the plaintiff. The trial court rendered judgment in favor of the defendant. This appeal followed.[2]

The parties stipulated to the following relevant facts. On June 23, 1995, pursuant to General Statutes §§ 22a-186 and 22a-174, as well as §§ 22a-174-3 (a), (b), (c), (f) and (g), 22a-174-18, 22a-174-23 and 22a-174-24 of the Regulations of Connecticut State Agencies, the plaintiff applied to the defendant for a permit to construct a hot mix bituminous concrete plant (asphalt plant) at property owned by the plaintiff at 157 East Aurora Street in Waterbury.[3] On November 5, 1996, the defendant issued permit no. 151 to the plaintiff, which included both a permit to construct an asphalt plant at the site and a conditional permit to operate a plant, provided that all emission testing was to be completed and the results found acceptable by the defendant within twelve months after the issuance of the permit, after which time permit no. 151 would expire. The conditional permit to operate stated that the defendant would not issue the plaintiff a final permit to operate until those two conditions were met. At the time that the plaintiff obtained permit no. 151, the agency regulations required, in the event that the holder of such a permit proved unable to complete construction within the time

[2] The plaintiff appealed to the Appellate Court from the judgment of the trial court. We subsequently transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] At the same time, the plaintiff sought and obtained a permit to construct a concrete batching plant on the same property. That permit is not the subject of this appeal.

specified, that the holder apply for renewal of the permit at least 120 days prior to its expiration date. Regs., Conn. State Agencies § 22a-174-3 (d) (9). The defendant informed the plaintiff of the deadline for a renewal application in a letter dated November 5, 1996.

On October 27, 1997, after the deadline established by § 22a-174-3 (d) (9) of the Regulations of Connecticut State Agencies had passed, the plaintiff requested a one year extension of permit no. 151. By letter dated January 16, 1998, the plaintiff requested confirmation from the defendant that the permit to construct remained valid, and acknowledged in the letter that the permit to operate had expired. In response, the defendant confirmed that the permit to construct remained valid, and also confirmed that the conditional permit to operate had expired on November 4, 1996, because of the plaintiff's failure to complete emissions testing within one year from issuance of the permit. The defendant's letter further informed the plaintiff that "[p]rior to commencement of operation, the [plaintiff] must obtain a [p]ermit to [o]perate . . . ."

Subsequently, on May 5, 1998, in response to concerns expressed by the federal Environmental Protection Agency (EPA) regarding the possible harmful effects of fugitive emissions from asphalt plants on public health and the environment, the legislature passed Public Acts 1998, No. 98-112, later codified at General Statutes (Rev. to 1999) § 22a-174 (n), which imposed a moratorium on the issuing of permits for asphalt plants until July 1, 2000. Based on the same concerns expressed by the EPA, on June 1, 1998, the legislature passed Public Acts 1998, No. 98-216, § 4, later codified at General Statutes (Rev. to 1999) § 22a-196, which provided in relevant part: "No asphalt batching or continuous mix facility shall be located in an area which is less than one-third of a mile in linear distance from any hospital, nursing home, school, area of critical

environmental concern, watercourse, or area occupied by residential housing. Such distance shall be measured from the outermost perimeter of such facility to the outermost point of such zones provided that any such facility in operation as of December 31, 1997, shall not be subject to the provisions of this section." On the basis of the plaintiff's own representation that the proposed asphalt plant would be located only 400 feet from the Naugatuck River, the defendant concluded that the proposed location of the facility did not meet the requirements of § 22a-196 because it would have placed the facility less than one third of a mile away from the river. Therefore, on June 28, 2000, the defendant informed the plaintiff that the permit to construct and to operate had been tentatively denied.

Following a trial, the court dismissed the action for lack of subject matter jurisdiction, based on its conclusion that the action was not ripe because § 22a-174 (n) rendered the plaintiff's right to proceed with the permitting process speculative and the plaintiff's alleged injuries hypothetical. The plaintiff appealed from the judgment to the Appellate Court, but withdrew its appeal on July 7, 2004, because the legislature had adjourned without extending the moratorium in § 22a-174 (n) beyond the July 1, 2004 expiration date.[4] At the same time that the plaintiff withdrew its appeal, it filed an unopposed motion to open the judgment of dismissal, which the trial court granted on July 7, 2004.

[4] In Public Acts, Spec. Sess., June, 2000, No. 00-1, § 31, the legislature had extended the original expiration date of the moratorium from July 1, 2000 to July 1, 2001. The legislature then extended the expiration date a second time to July 1, 2004, through Public Acts 2001, No. 01-204, § 11. At the time that the plaintiff withdrew its appeal, § 22a-174 had been further amended by Public Acts 2004, No. 04-151, § 1, inter alia, to redesignate § 22a-174 (n) as § 22a-174 (m).

In its subsequent memorandum of decision, the trial court rendered judgment for the defendant.[5]

## I

The plaintiff first claims that § 22a-196 violates its right to equal protection and due process under the federal and state constitutions because the statute does not bear a rational relation to a legitimate state interest. We disagree.

## A

We turn first to the plaintiff's claim that § 22a-196 violates its right to equal protection under the federal constitution. "The constitutionality of a statute presents a question of law over which our review is plenary. . . . It is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Citation omitted; internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 500, 915 A.2d 822 (2007).

"When a statute is challenged on equal protection grounds . . . the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard

---

[5] The trial court denied the plaintiff's subsequent motion for articulation, and the Appellate Court granted the plaintiff's motion for review of the trial court's denial of the motion for articulation, but denied the requested relief.

[under which] the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health,* 281 Conn. 277, 295, 914 A.2d 996 (2007). The plaintiff concedes that the present case does not involve either a suspect class or a fundamental right. Therefore, if the challenged classification in § 22a-196 is rationally related to a legitimate public interest, the statute does not violate the plaintiff's right to equal protection. Id.

In determining whether the challenged classification is rationally related to a legitimate public interest, we are mindful that "[t]he test . . . is whether this court can *conceive* of a rational basis for sustaining the legislation; we need not have evidence that the legislature actually acted upon that basis. . . . Further, the [e]qual [p]rotection [c]lause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." (Emphasis added; internal quotation marks omitted.) *Harris* v. *Commissioner of Correction,* 271 Conn. 808, 834, 860 A.2d 715 (2004). "Rational basis review is satisfied so long as there is a plausible policy reason for the classification . . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . To succeed, the party challenging the legislation must negative every conceivable basis which might support it . . . ." (Citation omitted; internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health,* supra, 281 Conn. 296.

The plaintiff challenges two sets of classifications that it claims are accorded different treatment under the regulatory scheme created by § 22a-196: (1) asphalt plants that had been in operation as of December 31, 1997, and asphalt plants that were not yet in operation as of that date; and (2) asphalt plants and other stationary sources[6] of fugitive emissions.[7] Specifically, the buffer zone requirement imposed by § 22a-196 applies only to asphalt plants not yet in operation as of December 31, 1997, and does not apply to asphalt plants already in operation as of that date, or to other stationary sources of pollution, such as, for example, cement plants, regardless of their effective date of operation. The plaintiff claims that the different treatment accorded by the statute to these two sets of classes lacks a rational basis. We address the plaintiff's challenges to each of these classifications separately.

The buffer zone requirement is intended to protect the various specified vulnerable areas from fugitive emissions from asphalt plants. Imposition of that requirement, therefore, on proposed asphalt plants is rationally related to the purpose of the statute. The question is whether the legislature's exemption of existing asphalt plants from that requirement renders the statute incapable of surviving rational basis scru-

[6] " 'Stationary source' " is defined in § 22a-174-1 (90) of the Regulations of Connecticut State Agencies (Rev. to 1998) as, "any building, structure, facility, equipment, operation, or installation which is located on one or more contiguous or adjacent properties and which is owned by or operated by the same person, or by persons under common control, which emits or may emit any air pollutant, and which does not move from location to location during normal operation except that portable rock crushers and portable stripping facilities which are moved from site to site but remain stationary during operation and asphalt plants which combine aggregate and asphalt while in motion are stationary sources."

[7] " 'Fugitive emissions' " are defined in § 22a-174-1 (32) of the Regulations of Connecticut State Agencies (Rev. to 1998) as, "fugitive dust or those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening."

tiny. In restricting application of § 22a-196 to asphalt plants not yet in operation as of December 31, 1997, the legislature "grandfathered" existing plants, a practice that the legislature employs often, in many different contexts. See, e.g., General Statutes § 7-471 (3) (exempting existing bargaining units from various requirements imposed by provision); General Statutes § 8-2 (c) (exempting from regulations restricting quarrying and clear cutting, "nonconforming uses that were in existence and that were approved on or before the effective date of regulations adopted under this section"); General Statutes § 17b-354c (a) (excepting applications filed on or before May 1, 2001, from restrictions on conversion of intermediate care facility beds to nursing home beds); General Statutes § 26-194 (a) (providing that "[n]o lease shall be granted to a resident of a state which does not lease shellfish grounds to residents of this state, except that any nonresident who was granted a lease on or before October 1, 1985, may, upon the expiration of such lease, apply for a renewal or further lease as provided in this section"); General Statutes § 38a-402 (13) (providing that "[n]o person may act as a title agent unless he is a commissioner of the Superior Court in good standing, except any individual who held a valid title insurance license on or before June 12, 1984"); General Statutes § 53-332 (barring burial of deceased persons within 350 feet from any dwelling house unless public highway intervenes between burial site and dwelling house, but excepting burials that take place in cemetery established on or before November 1, 1911).

A governing body may "grandfather," or exempt from regulation, bodies or systems already in place for a variety of different legitimate reasons. For instance, in situations such as this one, in determining whether to exempt any groups from a new regulation, the legislature may balance the benefit gained by imposing the

new rule against the burden likely to be placed on those who may be affected. In the case of § 22a-196, it is conceivable that the legislature performed such a balancing in drawing a distinction between existing and proposed asphalt plants in the imposition of the buffer zone requirement. Specifically, it is plausible that the legislature, in seeking to effectuate the underlying purpose of § 22a-196 of protecting vulnerable areas from fugitive emissions from asphalt plants, determined to apply the buffer zone requirement only to new plants because imposing the requirement on existing plants would place a significantly heavier burden on those entities. It is one thing to require those who propose a new asphalt plant to select the location of that plant in accordance with the buffer zone requirement; it is an entirely different matter to require those who already operate such a plant to *relocate* the facility in order to comply with the requirement. Although the environment may have been *better* protected by applying the buffer zone requirement to existing plants as well as proposed plants, the legislature was not obligated to impose the new requirement without taking into account the legitimate consideration of the undue burden that the imposition of the buffer zone requirement would place upon existing asphalt plants. As we have previously stated, "[i]n the area of economics and social welfare, a [s]tate does not violate the [e]qual [p]rotection [c]lause merely because the classifications made by its laws are imperfect." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health*, supra, 281 Conn. 299 n.12.

Similarly, we readily can conceive of a rational basis for the legislature's decision, at the time of the enactment of § 22a-196, for imposing the requirement on asphalt plants only, not on other sources of fugitive emissions. As we have mentioned previously in this opinion, the legislature passed § 22a-196 at a time when

the EPA had questioned the possible harmful effect on both public health and the environment of fugitive emissions from asphalt plants. There is no suggestion in the record that the EPA had expressed any such concerns regarding fugitive emissions from other stationary sources of fugitive emissions. It is the height of rationality for the legislature, in response to an EPA report expressing concerns regarding fugitive emissions from asphalt plants, to enact legislation regulating only those types of emissions.

Moreover, we find unpersuasive the plaintiff's argument that, because, according to the plaintiff, the subsequent final report issued by the EPA in December, 2000, concluded that fugitive emissions from asphalt plants pose no significant risk to the environment or to the public health, the trial court improperly concluded that § 22a-196 was rationally related to a legitimate state purpose at the time that the legislature enacted it. Even if the final report of the EPA could be interpreted to negate every conceivable rational basis justifying the buffer zone requirement of § 22a-196, an issue we need not resolve in this opinion, that fact would be irrelevant to the constitutionality of the statute. The question of whether a statute is rationally related to a legitimate state interest "must be evaluated in light of the *facts existing at the time the law was enacted* . . . ." (Emphasis altered; internal quotation marks omitted.) *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 580–81, 512 A.2d 893 (1986).

B

The plaintiff next claims that we should interpret article first, § 1, and article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, to require a heightened rational

basis review of the plaintiff's equal protection claim.[8] We disagree.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [222 Conn. 672, 684–86, 610 A.2d 1225 (1992)], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise

---

[8] Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

described, relevant public policies." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, supra, 281 Conn. 509–10.

The plaintiff concedes that the text and history of the constitution of Connecticut do not support the imposition of a heightened form of rational basis review. We turn, therefore, to the remaining four factors, beginning with the relevant federal precedents, a factor that weighs heavily against a finding that the state constitution affords greater protection. Rational basis review has long been described in federal case law as the most deferential standard of review, and the appropriate standard of review for claims such as this one, that involve purely economic regulation. In *Federal Communications Commission* v. *Beach Communications, Inc.*, 508 U.S. 307, 313–14, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993), the United States Supreme Court explained: "Whether embodied in the [f]ourteenth [a]mendment or inferred from the [f]ifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. . . . This standard of review is a paradigm of judicial restraint. The [c]onstitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." (Citations omitted; internal quotation marks omitted.) The decisions of the lower federal courts follow the Supreme Court's iteration of this very basic, well established principle. See, e.g., *Wine & Spirits Retailers*,

*Inc.* v. *Rhode Island*, 481 F.3d 1, 16 (1st Cir. 2007) ("economic legislation will be upheld as against an equal protection challenge if the means chosen by the legislature are rationally related to some legitimate government purpose" [internal quotation marks omitted]); *Minnesota Senior Federation, Metropolitan Region* v. *United States*, 273 F.3d 805, 808 (8th Cir. 2001) (rejecting equal protection challenge and explaining that "[i]n areas of social and economic policy, a statutory classification . . . must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" [internal quotation marks omitted]), cert. denied, 536 U.S. 939, 122 S. Ct. 2619, 153 L. Ed. 2d 803 (2002); *Collins* v. *Schweitzer, Inc.*, 21 F.3d 1491, 1494 (9th Cir.) (reviewing claim under rational basis test and stating that "[w]e review '[h]ealth, safety and economic classifications not based on race or gender . . . at the minimum level of equal protection analysis' "), cert. denied, 513 U.S. 962, 115 S. Ct. 422, 130 L. Ed. 2d 337 (1994); *Maine Central Railroad Co.* v. *Brotherhood of Maintenance of Way Employees*, 813 F.2d 484, 489 (1st Cir.) ("[t]o subject economic legislation, which the [c]ourt has said need only have a rational basis, to heightened scrutiny because its reach is particularized would diverge from the Supreme Court's equal protection analysis framework"), cert. denied, 484 U.S. 825, 108 S. Ct. 91, 98 L. Ed. 2d 52 (1987); *Commodity Futures Trading Commission* v. *American Board of Trade, Inc.*, 803 F.2d 1242, 1250 (2d Cir. 1986) ("When . . . economic regulation is challenged solely as violating the [e]qual [p]rotection [c]lause, this [c]ourt consistently defers to legislative determinations as to the desirability of particular statutory discriminations. . . . Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions pre-

sume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." [Internal quotation marks omitted.]); *Jackson Water Works, Inc.* v. *Public Utilities Commission*, 793 F.2d 1090, 1093 (9th Cir. 1986) (holding that District Court properly applied rational basis test and stating that "[w]here a regulation or statute affects only economic and not fundamental interests, the state is free to create any classification scheme that does not invidiously discriminate"), cert. denied, 479 U.S. 1102, 107 S. Ct. 1334, 94 L. Ed. 2d 184 (1987); *Ambach* v. *Bell*, 686 F.2d 974, 980 n.2 (D.C. Cir. 1982) ("where equal protection violations are alleged in the context of economic regulation, the appropriate standard of review is one of limited scrutiny in which there must be a rational basis for the legislation" [internal quotation marks omitted]).

The case law cited by the plaintiff in support of its contention that we should apply a more searching form of rational basis review in the present case is distinguishable. Specifically, the plaintiff relies on two very specific categories of cases in which federal courts, after engaging in a rather rigorous review of the statute or regulation at issue, have concluded that a law failed rational basis scrutiny, namely, cases involving politically unpopular groups and " 'important' " rights. See, e.g., *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 450, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (denial of special use permit for proposed group home for individuals with special needs violated equal protection because classification not rationally related to legitimate government purpose); *Metropolitan Life Ins. Co.* v. *Ward*, 470 U.S. 869, 882–83, 105 S. Ct. 1676, 84 L. Ed. 2d 751 (1985) (striking down Alabama law that taxed out-of-state insurance companies more than in-state companies because domestic preference not rationally related to legitimate state purpose). The plaintiff has

not demonstrated, however, that it is a member of a politically unpopular group, and this court never has recognized mere property rights to be "important" rights for purposes of equal protection analysis. Instead, the plaintiff's claim fits squarely within the category of claims traditionally accorded rational basis scrutiny— a claim based on a classification created by a purely economic regulation, not involving a suspect class or a fundamental right.

Sister state authority similarly weighs against applying any higher level of scrutiny other than standard rational basis analysis in the present case. Within the context of economic legislation that does not impact a suspect class or a fundamental right, state courts routinely hold that their state constitutions require no more exacting scrutiny than that mandated under the federal constitution, which is rational basis scrutiny. See, e.g., *Hutchinson* v. *Board of Alderman*, 423 So. 2d 1229, 1230 (La. App. 1982) (affirming declaratory judgment upholding constitutionality under both state and federal constitutions of fireworks ordinance barring most applications for licenses to sell specified pyrotechnics, but grandfathering applicants who had received permits as of 1975; state constitution employs same analysis as federal constitution when no suspect class or fundamental right is implicated by economic regulation, and plaintiff failed to show that grandfathering permits issued prior to 1976 was not rationally related to legitimate state interest); *Chebacco Liquor Mart, Inc.* v. *Alcoholic Beverages Control Commission*, 429 Mass. 721, 722, 711 N.E.2d 135 (1999) (concluding that statute allowing exception to prohibition of Sunday sales of alcoholic beverages for municipalities within ten miles of either New Hampshire or Vermont borders did not violate right to due process and equal protection under state constitution because differing treatment was rationally related to furtherance of legitimate state

interest, and noting that "[t]he standard under the [f]ederal and [s]tate [c]onstitutions is the same"); *Appeal of Salem Regional Medical Center*, 134 N.H. 207, 215, 590 A.2d 602 (1991) (regulatory scheme applying different standards to evaluation of applications for certificates of need for new health care facilities and applications to expand existing facilities valid under state constitution; because classification implicates primarily economic rights, proper standard is whether classification bears rational relationship to effectuation of legitimate state interest).

The plaintiff focuses on the same types of cases, in looking to case law from other states, as it does in its analysis of federal precedent, those involving important rights and those involving a politically unpopular group. As we already have stated, the plaintiff has not demonstrated that it is a member of a politically unpopular group, and we never have recognized a claim such as the plaintiff's, which implicates purely economic rights, to involve an important right.

We turn next to our own case law and precedent, which, consistently with that of other jurisdictions across the country, support the conclusion that, when economic regulation does not impact a fundamental right, a suspect class or a quasisuspect class, our state constitution generally mandates the same level of scrutiny as the federal constitution. See *Horton* v. *Meskill*, 172 Conn. 615, 639, 376 A.2d 359 (1977) ("[t]his court has many times noted that the equal protection clauses of the state and federal constitutions have a like meaning and impose similar constitutional limitations").

The plaintiff contends, nonetheless, that Connecticut courts have employed a more thorough review of regulations affecting business. This is simply not true. The primary case relied upon by the plaintiff is *City Recycling, Inc.* v. *State*, 257 Conn. 429, 444, 778 A.2d 77 (2001),

in which this court applied traditional equal protection analysis to conclude that General Statutes (Rev. to 1997) § 22a-208a (a), as amended by Public Acts 1997, No. 97-300, § 2, violated the plaintiff's equal protection rights guaranteed by both the federal and state constitutions. That case, however, involved a highly unusual circumstance, namely, the plaintiff had proven that the challenged statute "was enacted because of and specifically aimed at the plaintiff . . . ." Id., 449. In light of the fact that the trial court's findings negated any rational basis of which this court could have conceived to support the statute, coupled with the showing that the legislation was aimed solely at the plaintiff, and drafted in such a way that it affected only the plaintiff, we concluded that § 22a-208a (a) could not survive even rational basis scrutiny. Id., 453. Although the legislature enjoys great latitude in "address[ing] a problem in a piecemeal fashion [that power] does not encompass the liberty to target one entity and, without a rational basis, enact legislation to prevent that entity from doing what it otherwise could lawfully do . . . ." Id., 453–54.

The plaintiff contends that the legislative history of § 22a-196 demonstrates that the aim of the statute was to prevent its plant, as well as proposed plants in Colchester and Bridgeport, from being built. Specifically, the plaintiff points to the remarks of Representative Robert R. Simmons, who stated during the floor debate on the bill, "[i]t's my understanding from some of the literature that has been circulated on this amendment, that this amendment only affects Waterbury, Bridgeport and Colchester." 41 H.R. Proc., Pt. 16, 1998 Sess., pp. 5461–62. Additionally, the plaintiff cites to a statement that Senator Stephen Somma made in a newspaper article that " 'residents can rest assured that the plant that was proposed in the center of Waterbury will not happen . . . .' " These two statements fall far short of a demonstration that the statute was enacted out of any

intention by the legislature to target the plaintiff in particular. Indeed, it stands in stark contrast to the legislative history of § 22a-208a (a), the statute at issue in *City Recycling, Inc.*, in which a Representative admitted that the buffer zone restricting proximity to a day care center was added to the legislation because it was " 'prompted' " by the plaintiff's situation. *City Recycling, Inc.* v. *State*, supra, 257 Conn. 451, quoting 40 H.R. Proc., Pt. 16, 1997 Sess., p. 5843, remarks of Representative Jessie Stratton. In the present case, the mere acknowledgment that § 22a-196 would affect only the three mentioned facilities shows nothing more than that the three facilities were the only new asphalt plants proposed for construction in locations likely to be affected by the buffer zone requirement. Such an observation hardly amounts to evidence of legislative animus toward the three facilities.

Finally, policy reasons do not support according less deference to the legislature in the present case under the state constitution. In reviewing classifications created in the context of economic regulation, involving no suspect class or fundamental right, it is particularly appropriate to accord great deference to the legislature to make such judgments. As we already have noted, the legislature has the freedom to craft legislation to accomplish its purpose in gradual steps, for example, by grandfathering existing entities from the subject legislation. When such legislation does not impact a suspect class or a fundamental right, and in the absence of a showing of legislative hostility, there is no need, and it in fact would be improper and counterproductive, to subject such regulation to a higher level of scrutiny. It is sufficient if such regulations are rationally related to a legitimate state purpose.

The three policy reasons advanced by the plaintiff in support of applying a more searching level of review under the state constitution are unpersuasive. First, the

plaintiff argues that when there is any indication of legislative hostility toward a particular group, a higher level of scrutiny is appropriate. As we already have stated, the plaintiff has failed to establish that such legislative hostility was the impetus behind § 22a-196. Second, the plaintiff contends that its proposed plant, if completed, would have furthered the state's interests in protecting the environment and public health. This is merely a conclusory and speculative statement, not a policy reason that would support according a less deferential standard of review in the present case. Third, the plaintiff claims that the statute creates a "virtual monopoly" in the area of hot mix asphalt, because twenty-seven of the thirty-seven asphalt plants in existence are owned by two companies. Once again, the plaintiff confuses factual assertions in a particular case with policy reasons that would justify imposing a different level of scrutiny for an entire category of constitutional claims. Whether the imposition of a buffer zone requirement would result in the creation of a "virtual monopoly" was an issue that properly would have been raised to the legislature for its consideration during the passage of the legislation; it is not a policy reason that supports subjecting such legislation to a higher level of scrutiny than that accorded under the federal constitution.

Effectively, the plaintiff urges this court to accord a higher level of scrutiny to the legislature's decision to exempt existing asphalt plants from the buffer zone requirement, and to apply the requirement only to asphalt plants, because, in the plaintiff's view, the legislature was mistaken in concluding that § 22a-196 would serve the intended purpose of protecting the environment and public health. Put another way, the plaintiff argues that we should subject § 22a-196 to a higher level of scrutiny because, again, in the plaintiff's view, it is a bad law. This argument misconstrues the very concept of rational basis scrutiny, in which "[t]he test . . . is

whether this court can *conceive* of a rational basis for sustaining the legislation . . . ." (Emphasis added; internal quotation marks omitted.) *Harris* v. *Commissioner of Correction,* supra, 271 Conn. 834. We reiterate that "[t]o succeed, the party challenging the legislation must negative every conceivable basis which might support it . . . ." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health,* supra, 281 Conn. 296.

## C

The plaintiff next contends that § 22a-196 violates its right to due process under the federal and state constitutions. We disagree.

The plaintiff concedes that rational basis scrutiny applies to this claim. "Our due process inquiry takes the form of a two part analysis. [W]e must determine whether [the plaintiff] was deprived of a protected interest, and, if so, what process was [its] due." (Internal quotation marks omitted.) *Giaimo* v. *New Haven,* 257 Conn. 481, 499, 778 A.2d 33 (2001).

Accordingly, we first examine whether the plaintiff was deprived of a protected interest. "To have a property interest . . . a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." (Internal quotation marks omitted.) *Chatterjee* v. *Commissioner of Revenue Services,* 277 Conn. 681, 695, 894 A.2d 919 (2006). "Property interests, of course, are not created by the [c]onstitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (Internal quotation marks omitted.) *Giaimo* v. *New Haven,* supra, 257 Conn. 499. "If a claimant does not establish a constitutionally protected interest, the

due process analysis ceases because no process is constitutionally due for the deprivation of an interest that is not of constitutional magnitude." (Internal quotation marks omitted.) *Hunt* v. *Prior*, 236 Conn. 421, 442, 673 A.2d 514 (1996).

The plaintiff contends that it had a protected interest in its permit to construct an asphalt plant. We have held that a license or a permit becomes "a property right once it has been issued, and it remains such until its expiration date so long as the laws pertaining to its use are obeyed." *Hart Twin Volvo Corp.* v. *Commissioner of Motor Vehicles*, 165 Conn. 42, 46–47 n.1, 327 A.2d 588 (1973). Although the plaintiff had missed the deadline for requesting an extension of permit no. 151, the defendant effectively waived the deadline by conveying to the plaintiff, in its letter dated January 16, 1998, that the permit to construct remained valid at that time. Thus, the plaintiff had a protected property interest in the permit.

The plaintiff's claim fails, however, because, as we have already stated, § 22a-196 is rationally related to a legitimate state purpose, protecting the environment and public health. As we have already set forth in our equal protection analysis, the plaintiff bears the burden to negate every conceivable rational basis on which the legislature could have acted in passing the statute. The plaintiff has failed to make such a showing. Moreover, our analysis of the plaintiff's state constitutional claim yields the same result. For the same reasons that we concluded that our state constitution does not mandate a more rigorous rational basis review under the equal protection clause than that accorded under the federal equal protection clause, we conclude that the rational basis test under article first, § 8, of the constitution of Connecticut requires no more searching review than that applied under the federal constitution.

## II

Finally, the plaintiff claims that the trial court improperly concluded that the defendant did not apply § 22a-196 retroactively to the plaintiff in violation of § 55-3, which provides that no provision of the General Statutes that imposes a new obligation "on any person or corporation, shall be construed to have a retrospective effect." The question presented by the plaintiff's claim is whether the defendant, by denying the plaintiff a permit to construct and to operate an asphalt plant, improperly construed § 22a-196 to have a retrospective effect. Section 22a-196 (a), which was passed on June 1, 1998, provides in relevant part that "[n]o asphalt batching or continuous mix facility shall be located in an area which is less than one-third of a mile in linear distance from any . . . watercourse . . . ." The statute, as we have discussed at length in this opinion, exempts from the buffer zone requirement, "any such facility *in operation* as of December 31, 1997 . . . ." (Emphasis added.) General Statutes (Rev. to 1999) § 22a-196. It is undisputed that, at the time that § 22a-196 was passed, the plaintiff did not have a valid permit to operate an asphalt plant. It is further undisputed that, based on § 22a-196, by letter dated June 28, 2000, the defendant denied the plaintiff a permit to construct and to operate an asphalt plant.

The plaintiff appears to be arguing that the defendant improperly invalidated the permit to construct an asphalt plant by construing § 22a-196 to apply retrospectively to the permit. It is difficult to see, however, how the defendant could have avoided doing so, because § 22a-196 barred the location of an asphalt plant on the site proposed by the plaintiff, which is less than one third of a mile from the Naugatuck River. The defendant could not, therefore, grant the plaintiff a permit to operate an asphalt plant in that location. It is possible, therefore, that the defendant determined to

deny the permit to construct, because it deemed that permit to be useless, given the inability of the plaintiff at that point to obtain a valid permit to operate an asphalt plant. Even if we agreed with the plaintiff that the defendant improperly construed § 22a-196 to apply to the plaintiff retrospectively, by denying the plaintiff a permit to construct an asphalt plant, the plaintiff would be placed in the unenviable position of having a valid permit to construct an asphalt plant, without a permit to operate such a plant.[9]

Section 22a-196, however, prohibits the *location* of an asphalt plant in any area that does not satisfy the buffer zone requirement. Given that prohibition, and given the impossibility, therefore, of granting a permit to operate an asphalt plant in the proposed location, the defendant did not improperly construe § 22a-196 to apply retroactively to the plaintiff.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[9] The plaintiff's argument appears to rest on the assumption that, if its permit to construct an asphalt plant had not been denied, the defendant somehow would have been obligated to grant its permit to operate the plant, so long as the plaintiff fulfilled all the requirements in order to obtain a permit to operate, with the exception of the buffer zone requirement of § 22a-196. The plaintiff's theory sounds less like a claim of improper retrospective application and more like a takings claim based on its "reasonable investment-backed expectations of use of the property." (Internal quotation marks omitted.) *Cohen* v. *Hartford*, 244 Conn. 206, 223–24 n.24, 710 A.2d 746 (1998). This theory would be relevant to a takings claim—namely, that the defendant improperly took the plaintiff's property, i.e., the permit to construct, without just compensation—not a claim that the defendant improperly construed § 22a-196 to apply retroactively to the plaintiff. In its initial complaint, the plaintiff originally had claimed that application of § 22a-196 to it resulted in an unconstitutional taking of its property without just compensation. In response, the defendant had asserted a special defense of sovereign immunity. In the first revised and amended complaint, the plaintiff did not include the takings claim, and the second revised and amended complaint, which is the operative complaint, does not assert a cause of action based on the takings clause.